916 A.2d 569

**PENNSYLVANIA NATIONAL MUTUAL CASUALTY COMPANY, Appellant,**

**v.**

**Ellen L. BLACK, Individually and as Administratrix and Executrix of the Estate of Eric L. Black, Deceased, Randy L. Black, Roscoe L. Myers and Diane E. Myers, Individually and as Administratrix of the Estate of John R. Myers, Deceased, Appellees.**

Supreme Court of Pennsylvania.

Argued May 8, 2006.

Decided Feb. 21, 2007.

222

Peter James Speaker, Esq., Harrisburg, for Pennsylvania National Mutual Insurance Co.

Robert E. Kelly, Jr., Esq., Begene Ann Bahl, Esq., Harrisburg, for amicus curiae Pennsylvania Defense Institute.

James D. Young, Harrisburg, for Ellen L. Black.

Philip Samuel Cosentino, Esq., Chambersburg, for Roscoe L. and Diane E. Myers.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice BAER.

We granted review in this case to determine whether the Superior Court erred in concluding that a "setoff" provision in an automobile insurance policy was unenforceable as against public policy. A setoff provision, generally, provides for the reduction of a claimant's potential recovery under one part of an insurance policy, such as underinsured motorist coverage, by the amount the claimant recovered under another portion of the same insurance policy, such as bodily injury liability coverage. We conclude that the setoff provision at issue does not violate public policy. Accordingly, we reverse the decision of the Superior Court and reinstate the order of the Court of Common Pleas.

The facts of the case are undisputed. On May 15, 1999, an automobile driven by John R. Myers (John) and owned by his mother, Diane E. Myers, collided with an automobile driven and owned by Todd L. Jamison (Jamison). John and his passenger, Eric L. Black (Eric), died from injuries sustained during the accident. Jamison suffered injuries but survived. As discussed in detail below, the parents of Eric,[1] acting in their own capacity and as representatives of their son's estate, claimed that Eric's death resulted in part from Jamison's negligence in driving his car at an excessive speed. Accordingly, they sought recovery based on Jamison's negligence pursuant to various insurance policies. The Blacks also claimed that the accident resulted in part from John's negligence in failing to observe a stop sign. Consequently, the Blacks sought recovery based on John's negligence.[2]

1. The matter has been pursued by Ellen Black, Eric's mother, individually and as administratrix of the Estate of Eric Black, and by Randy Black, Eric's father. In this opinion, we will refer to these parties collectively as "the Blacks." Similarly, we will refer to John's parents, Roscoe and Diane Myers, and the Estate of John Myers collectively as "the Myers." The Blacks and Myers are Appellees before this Court.

2. Jamison also contended that he was injured as a result of John's negligence, and brought a suit against the Myers in the hope of recovering under the Myers' insurance policy. Jamison settled his claims against John's estate in August 2003 for $1000. While the

The dispute before this Court arises from a declaratory judgment action filed by the Myers' insurer, Appellant Pennsylvania National Mutual Casualty Insurance Company (Penn National), regarding the limits of coverage under the Myers' policy available to the Blacks as a result of Eric's death while a passenger in the Myers' car. The Blacks seek recovery from Penn National under the Myers' policy's bodily liability coverage provision based on John's negligence, in accord with traditional tort principals permitting a victim to recover from a tortfeasor. The Blacks also seek recovery from Penn National under the Myers' policy's underinsured motorist coverage provision, based on Jamison's negligence, the insufficiency of Jamison's (and Black's) insurance to recompense the Blacks fully, and Eric's status as a "class two insured"[3] by virtue of his being a passenger in the Myers' car.

At the time of the accident, Jamison was insured under a policy issued by Progressive Casualty Company providing bodily injury liability coverage of $15,000 per person and $30,000 per accident. Progressive tendered the per person limit of $15,000 to the Blacks in July 1999. Similarly, State Farm Insurance Company, which insured the Blacks, tendered to them $60,000, which was the limit of the underinsured motorist coverage under the Blacks' insurance policy. It is undisputed that the losses suffered by the Blacks exceeded the aggregate $75,000 paid under the Progressive and State Farm policies. Accordingly, the Blacks sought coverage under the Myers' insurance policy issued by Penn National providing, *inter alia,* bodily injury liability coverage with a limit of $100,000 per accident and underinsured motorist cov-

Jamison lawsuit plays some part in this case, it will only be mentioned as necessary, as it is collateral to the issue directly before us, and including unnecessary history pertaining to that action would confuse more than elucidate.

**3.** *See Utica Mut. Ins. Co. v. Contrisciane,* 473 A.2d 1005, 1010–11 (1984) (noting that occupants of vehicles, who are not named insureds or resident relatives of named insureds, are class two insureds who do not have a contractual relationship with the insurer as they have not paid premiums for the coverage and are not specifically intended beneficiaries of the policy).

erage with a limit of $100,000 per accident.[4] As previously noted, under the policy, Eric qualified as a class two insured because he was a guest passenger in the Myers' car. The Blacks claimed coverage under the bodily injury liability provision of the Myers' policy based on an assertion that John's negligence caused Eric's injuries. They additionally claimed under the underinsured motorist coverage of the Myers' policy based on Jamison's alleged negligence and the insufficiency of his insurance.

The Myers' policy's underinsured motorist coverage provision stated that Penn National would pay damages to which an insured "is legally entitled to recover from the owner or operator of an 'underinsured motor vehicle' because of 'bodily injury.'" Reproduced Record (R.R.) at R50a. The policy defined "underinsured motor vehicle" to exclude vehicles "for which liability coverage is provided under . . . this policy." *Id.* Accordingly, the vehicle driven by John, within which Eric was a passenger, could not be considered an underinsured motor vehicle under the Myers' policy because it was covered by that policy. Prior to recovery under the underinsured motorist provision, the policy also required that the party seeking recovery first exhaust "[t]he limits of liability under any applicable bodily injury bonds or policies." *Id.* The policy also prohibited duplicate payments: "No one will be entitled to receive duplicate payments for the same elements of loss under this coverage and . . . [a]ny Underinsured Motorist Coverage provided by this policy." R.R. at R23a. Significantly, the "setoff" provision of the underinsured motorist coverage at issue provided, "The limit of liability under this coverage is reduced by any amount paid to the same person for the

4. The Penn National policy provided for stacked coverage on three vehicles, thus providing up to $300,000 of underinsured motorist coverage. However, the parties agree that Black is not entitled to the stacked limit but rather, as a guest passenger is only entitled to the limit on the vehicle involved in the accident. Additionally, letters between counsel included in the record indicate that the Myers settled their claims for $200,000 of the stacked underinsured motorist coverage based on Jamison's negligence and waived their claim to the remaining $100,000, thus leaving $100,000 of potential coverage for the vehicle involved in the accident.

same accident under Part A [Liability Coverage] or Part C. [Underinsured Motorist Coverage]." R.R. at R51a.

The Blacks sought $200,000 of coverage from Penn National claiming that they were not bound by the policy's per person limits because Eric's mother, father and estate were separate "person[s]," and thus, one "person" could claim up to $100,000 under the bodily liability provision, and another "person" could claim up to $100,000 under the underinsured motorist coverage without violating the duplicate recovery provision or the per person limitations of the setoff provision. Penn National responded that the maximum recovery under the policy for the injuries suffered by Black was $100,000.[5]

Although Penn National and the Blacks engaged in negotiations, they were unable to reach an agreement. Despite disagreements regarding the details and timing of the offers, the parties stipulated that Penn National had paid to Jamison $1000 in bodily injury liability coverage based on John's negligence. Additionally, Penn National offered to settle the Blacks' bodily injury liability claims premised upon John's negligence by offering the remaining $99,000 of available coverage. Penn National later offered to settle the Blacks' claims for underinsured motorist coverage for $1,000, arguing that the remaining $99,000 of underinsured motorist coverage had been properly setoff by the $99,000 already tendered to the Blacks under the policy's bodily injury liability coverage.

In May 2001, the Blacks filed a complaint against Jamison and John's estate setting forth claims of wrongful death and survivorship based on Jamison's and John's alleged negligence.[6] In November 2002, Penn National filed a complaint against the Blacks and the Myers seeking a declaratory judgment limiting to $100,000 its total exposure to the Blacks

5. The Blacks failed to convince either the trial court or the Superior Court of the merits of this argument. Additionally, the Blacks filed a cross-petition for allowance of appeal challenging the Superior Court's denial of separate recoveries. Although the Blacks continue to argue that issue, we declined review and will not address it in this Opinion.

6. The Blacks additionally sought damages from the Pennsylvania Department of Transportation based on an allegedly dangerous condition of a highway pursuant to 42 Pa.C.S. § 8522(4).

under the bodily injury liability coverage and the underinsured motorist coverage, and requiring the Blacks to exhaust coverage provided by other relevant insurance policies before pursuing underinsured motorist coverage under Penn National's policy. After discovery, the parties stipulated to the relevant facts and filed cross-motions for summary judgment.

In December 2003, the trial court granted summary judgment to Penn National and denied the Blacks' motion for summary judgment. The court observed that the bodily injury coverage portion of the policy prohibited duplicate payments pursuant to the uninsured motorist coverage for the same element of loss.[7] The court found that the unambiguous intent of the contract of insurance was to limit any individual's total recovery to $100,000 regardless of the potential recovery scenario.[8]

The Blacks appealed to the Superior Court and filed a timely concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). In response, the trial court drafted a second opinion referring to its December 2003 opinion and additionally addressing the Blacks' claim that the setoff provision in the Penn National policy was void as against the public policy set forth in the Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa.C.S. §§ 1701 *et. seq.* According to the trial court, "The Blacks seek, as a matter of

7. While we agree with the result reached by the trial court, we note that the trial court stated, "The plain language of [the duplicate payments section] unequivocally provides that underinsured motorist coverage is not available in instances where the claimant is pursuing liability coverage under the policy." *See* Tr. Ct. Op., 12/31/03, at 9 (quoting the duplicate payments provision: "No one will be entitled to receive duplicate payments for the same elements of loss under this [bodily injury liability] coverage and ... [a]ny Underinsured Motorist Coverage provided by this policy."). As Penn National has offered to provide $99,000 under the bodily injury liability coverage and $1000 under the underinsured motorist coverage, it is clear that recovery can be attained by one claimant under both provisions, but may not exceed the total limit of $100,000, absent the applicability of the stacking provision.

8. The court noted that it did not address the merits of the competing claims of liability, which were not before it, but merely opined regarding the limits of the Penn National insurance policy.

public policy, to ignore the meeting of the minds and bestow upon themselves a windfall beyond what was contemplated in establishing premiums." Tr. Ct. Op., 5/19/04, at 2. The trial court quoted this Court's observation in *Prudential Property and Casualty Insurance Co. v. Colbert*, 572 Pa. 82, 813 A.2d 747, 752 (2002), that clear contractual language will not be invalidated absent "definitive indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy." Tr. Ct. Op., 5/19/04, at 3. The trial court also noted that this Court in *Colbert* reiterated that the primary public policy of the MVFRL was to limit the increases in insurance premiums in part by "protect[ing] insurers against the forced underwriting of unknown risks that insureds have neither disclosed nor paid to insure." Tr. Ct. Op., 5/19/04, at 2 (quoting *Colbert*, 813 A.2d at 754). The court relied upon prior Superior Court cases enforcing setoff provisions, *see Bowersox v. Progressive Cas. Ins. Co.*, 781 A.2d 1236 (Pa.Super.2001); *Jeffrey v. Erie Ins. Exch.*, 423 Pa.Super. 483, 621 A.2d 635 (1993), and distinguished the decision of the Court of Appeals for the Third Circuit in *Nationwide Mutual Insurance Co. v. Cosenza*, 258 F.3d 197 (3d Cir.2001), relied upon by the Blacks, noting that *Cosenza* involved a provision prohibiting dual recovery [9] rather than a setoff provision. The court concluded that the setoff provision did not violate public policy and accordingly found "no reason to override the clear contractual language of the Penn National Policy." Tr. Ct. Op., 5/19/04, at 4.

In an unpublished decision, the Superior Court affirmed in part and reversed in part, and remanded the case to the trial court.[10] The Superior Court agreed with the trial court's determination that the policy did not permit separate recoveries for Eric's estate and each of his parents. The court, however, disagreed with the trial court regarding the enforcement of the setoff provision. Initially, the court highlighted

9. The dual recovery provision in *Cosenza* provided, "The insured may recover for bodily injury under the Auto Liability coverage or the Underinsured Motorist coverage of this policy, but not under both coverages." 258 F.3d at 204.

10. Judge Tamilia concurred in the result.

the distinction between Penn National's setoff provision and a dual recovery provision. Nevertheless, with little analysis, the court found the setoff provision unenforceable based upon the court of appeals' holding in *Cosenza*, declaring a dual recovery provision unenforceable as against public policy. Specifically, the Superior Court stated:

> In a case such as this, to disallow the dual recovery exclusion while permitting the insurance company to invoke the set-off provision, results in a legal fiction whereby the secondary insured is theoretically allowed to recover [underinsured motorist] benefits but where, in actuality, because of the set-off provisions, the secondary insured recovers either nothing or some nominal sum.

Super. Ct. Op. at 11. Accordingly, the court found that the setoff provision violated the public policy underlying the MVFRL, reversed the summary judgment entered in favor of Penn National, and remanded for further proceedings. The court, however, failed to specify what public policy or what section of the MVFRL the setoff provision violated.

Penn National filed a petition for allowance of appeal with this Court, which we granted limited to the following question:

> Did the Superior Court err in ruling that the standard setoff provision in the Penn National Insurance policy (which reduces the amount recoverable as underinsured motorist benefits by the amount paid under the liability coverage of the same policy to the same person for the same accident) is void as against public policy?

*Penna. Nat'l Mut. Cas. Ins. Co. v. Black*, 885 A.2d 43, 43 (2005) (*per curiam*).

Initially, Penn National observes that when this Court has deemed policy language void as against public policy the relevant language has conflicted with specific language in the MVFRL. Penn National argues that the setoff provision at issue does not conflict with any language of the MVFRL. Instead, Penn National contends that the setoff provision supports the MVFRL's cost containment policy, emphasizing that this Court has recognized repeatedly that the primary

purpose of the repeal of the prior No–Fault Law and the enactment of the MVFRL was the reduction of insurance premiums. Penn National cites our caselaw rejecting the policy of "maximum feasible restoration" of the injured party under the No–Fault Law and embracing the MVFRL's aims of reducing premiums and allowing consumers to choose their level of insurance. *See Paylor v. Hartford Ins. Co.,* 536 Pa. 583, 640 A.2d 1234, 1235 (1994). According to Penn National, the setoff provision allows insurance companies to reduce premiums based on the expectation that the total potential payout will not exceed the stated limit of the underinsured motorist coverage rather than increase premiums to cover the greater potential payout of the combined limits of bodily injury liability and underinsured motorist coverage.

Additionally, Penn National relies upon the Pennsylvania Insurance Department's regulations. Although it notes that the Department has not specifically addressed the situation as it relates to underinsured motorist coverage, it has included a setoff provision in its standard form for uninsured motorist coverage. *See* 31 Pa.Code § 63.2 Exh. C. Penn National persuasively argues that a setoff provision cannot be contrary to the public policy of the MVFRL if the Department includes a setoff provision for uninsured motorist coverage in a standard form.

In rejecting the Blacks' argument that the setoff provision undermines coverage mandated by the MVFRL, Penn National notes that the MVFRL obligates the offer of underinsured motorist coverage in every policy, but allows insureds to reject the coverage. *See* 75 Pa.C.S. § 1731(a), (c) (allowing named insured to reject coverage for "myself and all relatives residing in my household"). Moreover, Penn National observes that MVFRL does not define "insureds" to include guest passengers, *see* 75 Pa.C.S. § 1702, but requires only that the term include named insureds and resident relatives of the named insureds. Accordingly, it asserts, "the MVFRL does not require that insurers even offer [underinsured motorist] coverage for guest passengers." Brief for Appellant at 11. Penn National notes that the Myers were free to purchase

increased coverage but chose not to do so, and accordingly paid a lower premium.[11]   If a court required insurers to provide this additional coverage, insurers would increase premiums in contravention of the aim of the MVFRL to reduce premiums by providing insureds with the option to purchase lower levels of coverage.

Penn National contends that the Superior Court in the case at bar departed from prior Superior Court decisions approving similar setoff provisions, including *Bowersox, Pempkowski v. State Farm Mutual Automobile Insurance Co.,* 451 Pa.Super. 61, 678 A.2d 398 (1996), *aff'd per curiam,* 548 Pa. 23, 693 A.2d 201 (1997), *State Farm Automobile Insurance Co. v. Broughton,* 423 Pa.Super. 519, 621 A.2d 654 (1993),[12] and *Jeffrey.* Penn National criticizes the Superior Court's rejection of this line of cases in favor of reliance upon an allegedly "growing body of law," consisting only of the court of appeals' decision in *Cosenza.*   Penn National notes that a prior panel of the Superior Court distinguished *Cosenza* by noting that setoff provisions are more limited than prohibitions against dual recovery.   *See Bowersox,* 781 A.2d at 1243 n. 10. Penn National explains that a "dual recovery provision" prohibits *any* recovery of underinsured motorist benefits if the plaintiff received any liability benefits, whereas the "setoff provision" merely sets the upward limit of recovery under both coverage provisions of the policy at $100,000.[13]

In contrast, the Blacks argue that the Superior Court correctly found that the setoff provision was unenforceable as against the public policy of the MVFRL.   The Blacks assert that the Superior Court "correctly recognized that in multiple tortfeasor cases, permitting the insurance company to invoke the setoff provision frustrates both the purpose of [underin-

**11.**   Penn National also notes that the Blacks are receiving the benefit of the Myers' purchase of $100,000 underinsured motorist coverage, despite only purchasing $60,000 under their own insurance policy.

**12.**   Although this Court granted review of the decision in *Broughton,* the parties discontinued the appeal.

**13.**   The Pennsylvania Defense Institute filed an *amicus curiae* brief in support of Penn National echoing many of the points raised by Penn National.

sured motorist coverage] and the dictates of the [MVFRL]" and thus is "impermissible according to this Honorable Court's holding in [*Colbert* ]." Brief for Appellees at 5–6. The Blacks rely on our decision in *Colbert*, setting aside an insurance policy's definition of an "insured" that conflicted with the MVFRL's definition of the same term.

In *Colbert*, this Court accepted for review two questions certified to this Court by the United States Court of Appeals for the Third Circuit. The Claimant, Adam Colbert, suffered injuries while driving his own car. After exhausting the coverage on his own policy and the tortfeasor's policy, Colbert, who resided with his father, sought coverage as a resident relative under his father's policy's underinsured motorist coverage. We granted review to consider whether the father's policy's definition of an "insured," which encompassed resident relatives only when they occupied a vehicle insured by the policy, impermissibly narrowed and conflicted with the definition in the MVFRL providing coverage to resident relatives generally. Although we acknowledged that courts generally should enforce clear and unambiguous contractual language in the absence of a violation of public policy, we also observed that "stipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions which are applicable to, and consequently form a part of, the contract, must yield to the statute, and are invalid, since contracts cannot change existing statutory laws." *Id.* at 751 (internal citations omitted). Accordingly, we found that the policy's narrower definition of the term insured impermissibly violated the MVFRL.[14]

The Blacks claim that our decision in *Colbert* supplants the Superior Court decision in *Bowersox* upholding setoffs. The Blacks cite the concluding paragraph of the *Bowersox* decision in which the court expressed its discomfort with enforcing the

14. Understandably, the Blacks do not emphasize our analysis of the second question addressed in *Colbert*, in which we held that the policy's family car exclusion did not violate public policy and therefore was enforceable. As discussed more fully below, we rejected the plaintiff's claim in part because holding the exclusion unenforceable would result in increased premiums and thus would hinder the cost containment purpose of the MVFRL.

setoff provision to deny underinsured motorist benefits for which premiums had been paid, but found itself constrained by its own precedent enforcing setoff provisions absent any contrary action by this Court or the legislature.[15] *Bowersox*, 781 A.2d at 1243. Although it is not entirely clear how the decision in *Colbert* would have changed the Superior Court's analysis in *Bowersox*, it appears that the Blacks rely on *Colbert* to support their argument that courts can refuse to enforce setoff provisions contrary to the MVFRL.

The Blacks fail to align their case with our decision in *Colbert* by repeating the Superior Court's failure to develop the alleged conflict between the setoff provision and any specific provision of the MVFRL. Instead, they contend that public policy favors a liberal construction of the MVFRL and underinsured motorist provisions to embody the core remedial purpose of compensating individuals injured in motor vehicle accidents.

The Blacks attempt to distinguish cases in which this Court has enforced insurance policy exclusions to deny or limit coverage by arguing that the instant case involves multiple tortfeasors triggering the various coverages purchased by the Myers. They assert that the policy provides $100,000 of bodily injury liability coverage for the Myers' negligence and $100,000 of underinsured motorist coverage to compensate an insured who cannot be fully compensated by other available insurance coverages. Essentially, they argue that the policy was clearly "designed to protect Appellees from, not just one, but two negligent drivers who caused injury to Appellees." Brief for Appellees at 12. They contend that unlike other

15. In *Bowersox*, the application of the setoff provision resulted in no recovery under the $50,000 underinsured motorist coverage because the claimant received the entire $50,000 under the liability coverage. The court expressed discomfort in that the setoff provision "operates to eliminate entirely the uninsured or underinsured motorist coverage (as this coverage cannot be greater than the liability coverage)." *Bowersox*, 781 A.2d at 1243. The court did not recognize that there could be cases, such as the case at bar, where a claimant could obtain coverage under both provisions of the policy; nor did the court consider that the policy under the MVFRL is to allow insureds to choose less coverage in exchange for reduced premiums as discussed *infra*.

cases decided by this Court, they are not seeking *gratis* coverage but rather are seeking to recover under coverage for which premiums were paid.

The Blacks rely upon the federal precedent of *Nationwide Mutual Ins. Co. v. Cosenza*, 258 F.3d 197 (3d Cir.2001), which declared an insurance policy's prohibition against dual recovery void as against public policy, and argue that the decision in this case should mirror the federal precedent. The Blacks observe that the instant case and *Cosenza* each involve an automobile collision with two allegedly negligent drivers and turn on an insurance policy covering one of the automobiles, under which non-negligent injured passengers are covered as insureds. In *Cosenza*, the non-negligent passengers recovered under the policy's liability coverage, but also sought monies under the underinsured motorists coverage due to the coverage deficiencies of the other tortfeasor. The policy included a prohibition against dual recovery providing that, "[t]he insured may recover for bodily injury under the Auto Liability coverage or the Underinsured Motorist coverage of this policy, but not under both coverages." *Id.* at 204.

The court of appeals held that the policy provision was void as against the public policy of protecting injured individuals from the insurance purchasing decisions of underinsured tortfeasors. In that case, the court considered the MVFRL a remedial statute that should be construed liberally to compensate victims. The court of appeals concluded that enforcement of the dual recovery prohibition would violate the policy of the MVFRL in multiple tortfeasor cases.[16] The court found that the denial of underinsured motorist benefits would result in the denial of coverage for which the insureds had paid premiums. The Blacks allege that the dual recovery prohibition in *Cosenza* and the setoff provision in this case have the same effect of denying coverage to injured occupants in a

16. Presumably, if the accident involved only one tortfeasor then one of the coverage provisions would not be applicable either because the liability provision would not be triggered by the negligence of an insured under the policy or because there would be no other tortfeasor to trigger the underinsured motorist coverage.

multiple tortfeasor case. Accordingly, the Blacks urge the Court to affirm the decision of the Superior Court.

In this case, we must determine whether the setoff provision violates public policy. Accordingly, we are presented with a question of law as to which our scope of review is plenary and our standard of review is *de novo*. *See Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659, 664 n. 4 (2002).

"Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy." *Colbert,* 813 A.2d at 750. In recent years, this Court has addressed several claims that unambiguous provisions in automobile insurance policies are unenforceable because they violate public policies expressed in or underlying the MVFRL. In response, we have repeatedly emphasized our reticence to throw aside clear contractual language based on "the often formless face of public policy." *Id.* at 752.

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.... Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts ... contrary to public policy. The courts must be content to await legislative action.

*Id. See Burstein v. Prudential Property and Casualty Insur. Co.,* 570 Pa. 177, 809 A.2d 204, 207 (2002); *Eichelman v. N'wide Insur. Co.,* 551 Pa. 558, 711 A.2d 1006, 1008 (1998).

As the Blacks recognize, we concluded in *Colbert* that the insurance claimants demonstrated that the policy defined the term "insured" more narrowly than the definition of the term in the MVFRL, and, in so doing, denied coverage mandated by the MVFRL. Accordingly, we invalidated that portion of

the contract, despite its clarity, as contrary to the express public policy of the Commonwealth manifested through the language of the MVFRL. We held that "stipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions which are applicable to, and consequently form a part of, the contract, must yield to the statute, and are invalid, since contracts cannot change existing statutory laws." *Colbert*, 813 A.2d at 751 (internal citations omitted).

In the case at bar, the Blacks do not suggest that the setoff provision is ambiguous. Instead, they argue that it is contrary to public policy. In determining whether the provision violates public policy, we first consider whether the setoff provision is directly contrary to the language of the MVFRL as was the case in the first question addressed in *Colbert*. The Blacks' claim that the MVFRL *mandates* underinsured motorist coverage misstates the case; the relevant section requires only the *offer* of such coverage and allows the insured to choose the level of coverage up to the limit of the liability coverage purchased under the policy, or to decline such coverage entirely. *See* 75 Pa.C.S. § 1731(a) ("Purchase of uninsured motorist and underinsured motorist coverage is optional."); § 1736 ("The coverage provided under this subchapter may be offered by insurers in amounts higher than those required by this chapter but may not be greater than the limits of liability specified in the bodily injury liability provisions of the insured's policy."). In this case, Penn National complied by offering the coverage and the Myers accepted the offer and paid premiums for $100,000 of underinsured motorist coverage, subject to the relevant exclusion and setoff provisions. The Blacks fail to cite any statutory provision establishing a minimum level of coverage that the policy failed to provide or any statutory language forbidding a setoff provision.

In contrast, the Department of Insurance, the agency charged with responsibility for approving insurance policies issued in the Commonwealth, 40 P.S. § 477b, and for administering and enforcing the MVFRL, *see Burstein*, 809 A.2d at 208, indicated its approval of setoff provisions by including a

setoff provision in its standard form for uninsured motorist coverage.[17] *See* 31 Pa.Code § 63.2 Exh. C("(c) [A]ny payment made under this endorsement [related to Uninsured Motorist coverage] to or for any insured shall be applied in reduction of the amount of damages which he may be entitled to recover from any person insured under the Bodily Injury Liability Coverage of the policy."). Accordingly, we conclude that the setoff provision does not expressly contradict the statutory language of the MVFRL.

We next consider the more amorphous question whether the setoff provision violates the public policy underlying the MVFRL generally and specifically with respect to its provisions relating to underinsured motorist coverage. The Blacks rely on the court of appeals' claim in *Cosenza* that "Pennsylvania courts are unanimous that the legislative intent underlying the MVFRL was to establish a liberal compensatory scheme of underinsured motorist protection." Brief of Appellees at 16 (quoting 258 F.3d at 208).

Although it is beyond cavil that one purpose of the underinsured motorist provisions of the MVFRL is to provide coverage to those injured by a tortfeasor who lacks adequate coverage, we also have held that this is not a public policy "overriding every other consideration in contract construction." *Eichelman*, 711 A.2d at 1010. In contrast, we have emphasized the cost containment policy underlying the enactment of the MVFRL: "The repeal of the No–Fault Act and the enactment of the MVFRL reflected a legislative concern for the spiraling consumer cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways." *Paylor*, 640 A.2d at 1235.

> [W]hile cost containment is not the only objective of the statute, it has become an increasingly significant one, and it is apparent that the General Assembly has been employing the vehicle of free consumer choice with greater latitude and frequency in furtherance of this objective.... [C]ost con-

---

**17.** The Blacks have not suggested that the public policy supporting underinsured motorist coverage differs from that supporting uninsured motorist coverage.

tainment is inextricably linked to [underinsured and uninsured] motorist coverage.

*Progressive N. Insur. Co. v. Schneck*, 572 Pa. 216, 813 A.2d 828, 832 (2002) (internal citation omitted). Our role is not to weigh the benefits of these two competing public policies, but rather to determine whether the setoff provision violates either public policy.

In this case, we conclude that the setoff provision in question conflicts with neither policy. In *Burstein, Paylor, Colbert*, and other recent cases, this Court enforced insurance policy provisions that absolutely excluded a subset of coverage, such as coverage of injuries sustained while riding in a household vehicle not insured under the relevant policy. In this case, we are not faced with an exclusion, but rather with an unambiguous contractual provision imposing a cap on the total coverage provided by the insurance policy. Applying the setoff provision, Penn National did not deny the Blacks coverage but rather offered to pay the limit of coverage purchased by the Myers. The Myers purchased $100,000 of liability coverage to provide for those injured as a result of the negligence of a driver of a vehicle insured under the policy, such as the Myers' car in this case, and $100,000 of underinsured motorist coverage to provide for injuries to insureds where the injuries result from the negligence of an underinsured driver, such as Jamison in this case.

The premiums the Myers paid for this coverage were calculated based on the inclusion of the setoff provision in the section entitled "Limit of Liability." R.R. at R51a. The setoff provision unambiguously provides that the "limit of liability" under the underinsured motorist coverage "is reduced by any amount paid to the same person for the same accident" under the bodily injury liability coverage. *Id.* Accordingly, the terms of the policy clearly limit total recovery under these facts to $100,000. To allow recovery of $200,000 to any individual guest passenger despite the unambiguous language of the insurance policy would be to provide coverage

for which premiums have not been paid.[18] We have repeatedly enforced contractual language to avoid *gratis* coverage.

Moreover, the setoff provision furthers the cost containment purpose of allowing consumers to weigh the benefits of increased coverage against the related premium increases. "By limiting coverage, the insurer lowers its risk, and the cost of insurance is lessened. The outcome does not violate public policy; rather it is favored." *Schneck*, 813 A.2d at 833. While the Myers may have been unable to negotiate a policy without a setoff provision, there is nothing in the record to suggest

**18.** While we accept the analysis presented by Chief Justice Cappy in support of the conclusion that the MVFRL favors the provision of "excess" rather than "gap" underinsured motorist coverage, it would still require several assumptions to conclude that the setoff provision, as applied in this case, is contrary to a long-standing and clearly expressed public policy sufficient to justify the voiding of the unambiguous language agreed to by the parties. *See Colbert*, 813 A.2d at 750. First, the cases cited by the dissent invalidate setoff provisions reducing an insured's recovery by any amounts recovered from a *third-party tortfeasor* under a separate policy. The trial court below aptly distinguished the Superior Court case relied upon by the dissent, *Allwein v. Donegal Mutual Insurance Co.*, 448 Pa.Super. 364, 671 A.2d 744 (1996) (holding an offset provision for payment made by a third party tortfeasor invalid as contrary to the MVFRL's provision of excess insurance): "[Unlike in *Allwein*,] the Penn National Policy provides setoff provisions for claims made by the same insured under the same policy." Tr. Ct. Op., 5/19/04, at 2. Indeed, in this case, the Blacks received from Penn National a tender of coverage in excess of the amount they received from the third-party tortfeasor, Jamison, and in excess of the amount they received under their own underinsured motorist coverage. The only reduction in the limits was based on amounts tendered under the same policy.

Additionally, it is not clear whether the MVFRL mandates the offer of underinsured motorist coverage for guest passengers, even though Penn National's policy extends coverage to "any other person 'occupying' your covered auto." R.R. at R50a. While the MVFRL does not define the class of persons for which underinsured motorist coverage must be offered, it does inform those desiring to waive underinsurance coverage that "Underinsured coverage protects *me and relatives living in my household* for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages." 75 Pa.C.S. § 1731 (emphasis added). This statement makes no reference to guest passengers. Absent any statement by the legislature requiring a minimum of underinsured motorist coverage to guest passengers or forbidding setoff provisions and in the absence of a previous expression of a clear public policy against such provisions, we are unwilling to declare the unambiguous set-off provision in this policy void as against public policy.

that they could not have sought coverage of $200,000, subject to the setoff provision, rather than $100,000, subject to the setoff provision.

Although we will not speak to the merits of the decision in *Cosenza*, we note that the setoff provision at issue is readily distinguishable from the dual recovery prohibition in that case. Under the dual recovery prohibition, insureds cannot recover anything under the underinsured motorist coverage if they have received even one dollar under the liability provision, despite paying for underinsured motorist coverage. In contrast, the setoff provision allows for some recovery under the underinsured motorist coverage in addition to the liability provision. For example, in this case, Penn National offered to pay Jamison $1000 under the liability coverage for damages due to John's negligence, thus leaving $99,000 of liability coverage payable to the Blacks. The Blacks may then recover another $1000 under underinsured motorist coverage for Jamison's negligence. Significantly, Penn National suggests the potential of a fact pattern whereby Penn National could have paid Jamison $99,000 of liability coverage as compensation for John's negligence and the Blacks $1000 of liability coverage for John's negligence. Under that scenario, there is no indication that the Blacks would not have recovered $99,000 under the underinsured motorist policy based on Jamison's negligence after applying the setoff provision. Under either scenario, the Blacks would receive $100,000.

The policy as written guarantees up to $100,000 of coverage from whatever source to an insured injured in an accident regardless of the identity or number of negligent parties. If the Myers had desired $200,000 of total coverage, they could have purchased that amount of bodily injury liability coverage and the commensurate amount of underinsured motorist coverage for a higher premium. They did not, however, and we will not rewrite the policy. Instead, we will enforce the setoff provision as written consistently with the policy of the MVFRL to allow individuals to balance the benefits of added coverage against the resulting increases in premiums, absent any contrary statutory provision. Accordingly, we reverse the

decision of the Superior Court and reinstate the trial court's grant of summary judgment to Appellant Penn National and the denial of summary judgment to Appellees.

Justice BALDWIN did not participate in the consideration or decision of this case.

Former Justice NEWMAN did not participate in the decision of this case.

Justices CASTILLE, SAYLOR and EAKIN join the opinion.

Justice CAPPY files a dissenting opinion.

Chief Justice CAPPY, dissenting.

The majority concludes that there is no public policy in the Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S. § 1701 *et seq.*, that is offended by application of the set-off provision in the automobile insurance policy ("Policy") that Appellant Penn National Mutual Casualty Insurance Company ("Penn National") issued, and that the cost containment objective of the statute is reason enough to allow the set-off's enforcement. I disagree, and therefore, respectfully dissent.

This Court has articulated a test for determining whether an insurance contract term is unenforceable because it violates public policy, stating that " '[i]n the absence of a plain indication of [a dominant] public policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards,' the Court should not assume to declare contracts contrary to public policy.' " *Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006, 1008 (1998). In addition, this Court has instructed that the application of public policy concerns in determining whether an insurance contract provision is invalid is fact dependent. *Burstein v. Prudential Prop. Cas. Ins. Co.*, 570 Pa. 177, 809 A.2d 204, 207 (2002).

In the present case, Eric Black ("Eric") was a passenger in a vehicle driven by John R. Myers ("Myers"). Eric was killed

when the vehicle was struck by a vehicle driven by Todd L. Jamison ("Jamison"). Both Myers and Jamison were negligent and caused Eric's death. Eric was an insured under the Policy insuring the Myers vehicle. The Policy provides $100,000 in liability coverage and $100,000 in underinsured motorist ("UIM") coverage to insureds. Those entitled to compensation for Eric's death (the "Blacks") have recovered insurance benefits, including $15,000 in liability coverage from Jamison's insurer. They have also received a tender of $99,000 in liability coverage from Penn National. Nevertheless, the Blacks have losses that are uncompensated. The Policy's set-off provision reduces, dollar for dollar, the $100,000 in UIM coverage that the Policy provides to the Blacks as a result of Jamison's negligence by the $99,000 in liability coverage that Penn National has tendered to the Blacks under the Policy as a result of Myers' negligence.

I believe that when this particular result is measured against the objective the General Assembly intended to advance in Pennsylvania by incorporating UIM coverage into the MVFRL, the test for declaring a contract term void as against public policy is met.

UIM coverage typically protects the purchaser and any other person the insurance contract designates as an insured from the risk that they will sustain injuries due to the negligence of another driver who is without sufficient liability insurance. Despite this typical approach, the specific nature of UIM coverage differs from state to state, insofar as two basic categories of UIM insurance have developed nationwide, each reflecting a fundamentally different view of the objective and operation of UIM coverage. James R. Ronca ("*Ronca*") *et al., Pennsylvania Motor Vehicle Insurance—An Analysis of the Financial Responsibility Law* § 6.2 at 112–114.1 (2d ed.2005); *North River Ins. Co. v. Tabor*, 934 F.2d 461, 464 (3d Cir.1991) (applying Pennsylvania law); *Allwein v. Donegal Mutual Ins. Co.*, 448 Pa.Super. 364, 671 A.2d 744, 747 (1996).

The first category is referred to as "excess" UIM coverage, and aims to maximize the potential for full compensation to the injured insured. *Id.* Thus, excess UIM gives to the

injured insured a fund that supplements the fund provided by the tortfeasor's liability coverage, up to the injured insured's UIM policy limits or until he is compensated for his losses. *Id.* The second category is referred to as "gap" UIM coverage. It aims to place the injured insured in the same position he would have occupied had the tortfeasor carried liability coverage in an amount that matches the injured insured's UIM coverage. *Id.* Thus, gap UIM coverage gives to the injured insured a fund that fills in any gap between the tortfeasor's liability coverage and the injured insured's UIM policy limit. *Id.*[1]

These two distinct categories of UIM coverage are realized through distinct statutory provisions, and are based on different statutory notions of what constitutes an underinsured motor vehicle and insufficient liability coverage. *Ronca* at 113. Under those statutes that provide for excess UIM coverage, a vehicle is deemed underinsured when its liability limits are insufficient to compensate the injured insured for his damages, and no explicit limitation on UIM recovery is stated. *Id.*[2] Under those statutes that provide for gap UIM coverage, a tortfeasor's vehicle is deemed underinsured when

1. The following example demonstrates the difference between excess and gap UIM coverage. Suppose that an injured insured is legally entitled to damages of $100,000; that the tortfeasor's liability insurance is $20,000; and that the injured insured's UIM coverage limit is $50,000. Under excess UIM coverage, the injured insured's total recovery is $70,000, with UIM coverage of $50,000 being paid in addition to the amount the insured receives under liability coverage, $20,000. Under gap UIM coverage, the injured insured's total recovery is $50,000, with the first $20,000 coming from the tortfeasor's liability coverage and the remaining $30,000, coming from the injured insured's UIM coverage, to fill in the gap between the tortfeasor's liability coverage and the injured insured's UIM coverage. *Ronca* at 113–114.

2. *See e.g.,* Washington Rev.Code Ann. § 48–22.030(1) ("Underinsured motor vehicle' means a motor vehicle with respect to the ownership, maintenance, or use of which either no bodily injury or property damage liability bond or insurance policy applies at the time of an accident, or with respect to which the sum of the limits of liability under all bodily injury or property damage liability bonds and insurance policies applicable to a covered person after an accident is less than the applicable damages which the covered person is legally entitled to recover.")

its liability limits are less than the UIM limits of the injured insured. *Id.*[3]

Several courts have held that in the MVFRL, the General Assembly provided for excess UIM coverage. *North River Ins. Co. v. Tabor,* 934 F.2d at 464; *Allwein,* 671 A.2d at 747; *Conrad v. Progressive Cas. Ins. Co.,* 48 Pa. D. & C.3d 71 (Pa.Com.Pl.1987); *accord Ronca,* at 113–14.

I agree. The words of the MVFRL in this regard are clear. 1 Pa.C.S. § 1921(b). From its inception, the MVFRL has stated that "[u]nderinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from the owners or operators of underinsured motor vehicles[,]" and has defined an "underinsured motor vehicle" as "[a] motor vehicle for which the limits of available liability insurance and self-insurance *are insufficient to pay losses and damages.*" 75 Pa.C.S. §§ 1731(c), 1702 (emphasis added); *Tabor,* 934 F.2d at 465; *Allwein,* 671 A.2d at 749–49; *Ronca* at 113–114.

Accordingly, by way of UIM insurance in the MVFRL, through the statute's plain language, the General Assembly chose to foster the policy of not only providing a source of recovery to those insureds who are injured by a negligent driver whose liability coverage is insufficient to compensate the insured for his losses, but also, in the case of UIM coverage, the policy of maximizing the potential for a full recovery.[4]

---

**3.** *See e.g.* Conn. Gen. Stat. § 38a–336(e) ("For the purposes of this section, an 'underinsured motor vehicle' means a motor vehicle with respect to which the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the applicable limits of liability under the uninsured motorist portion of the policy against which claim is made under subsection (b) of this section.")

**4.** I acknowledge that the General Assembly departed from the policy of "maximum feasible restoration" embodied in the now defunct No–Fault Act when it enacted the MVFRL. *Paylor v. Hartford, Ins. Co.,* 536 Pa. 583, 640 A.2d 1234, 1240 (1994). Even so, the General Assembly chose to incorporate into the MVFRL the type of UIM coverage that serves to

Application of the set-off provision in this case frustrates these policy choices. It eliminates the UIM insurance the General Assembly gave the Myers the right to buy for their passengers; it precludes the Blacks from recovering for the negligence of Jamison, the second and underinsured driver;[5] it prevents UIM coverage from having its desired statutory effect of compensating the Blacks as fully as possible; and it affords the Blacks with less UIM coverage than the MVFRL intends them to have. As such, the set-off violates Pennsylvania public policy, and cannot be enforced. 75 Pa.C.S. §§ 1702, 1731.

Moreover, the grounds that underlie the majority's conclusion to the contrary do not dissuade me of my position. The majority upholds the set-off because of the MVFRL's cost containment objective. Although enactment of the MVFRL grew out of a legislative concern for the spiraling costs of automobile insurance, *see Progressive Northern Ins. Co. v. Schneck*, 572 Pa. 216, 813 A.2d 828, 832 (2002), the cost containment objective cannot be permitted to contradict or undo the nature of UIM insurance that the General Assembly enacted. Further, as this Court has recognized, since the policy concern of cost containment can be used to defend virtually any contractual provision that restricts coverage, it cannot lead to the validation of any and every contractual term that arguably results in less costly insurance. *Burstein*, 809 A.2d at 208. " '[R]ather, it functions to protect insurers against forced underwriting of unknown risks that insureds have neither disclosed nor paid to insure.' *Id.* If the Policy's set-off provision were to be invalidated, Penn National would not be forced to underwrite an unknown risk for which it received no premium, as would have occurred in *Burstein*, had

compensate the injured insured as fully as is possible. 75 Pa.C.S. §§ 1702, 1731(c).

5. Due to the presence of two negligent drivers, Myers and Jamison, in a two-vehicle accident, this appeal does not present us with a claimant who is attempting to convert UIM insurance benefits into additional liability insurance, as would be the case if the accident involved only the Myers vehicle. Therefore, Pennsylvania decisions upholding automobile insurance contract provisions that prevent such a conversion from occurring are inapplicable. *See, e.g., Paylor*, 640 A.2d at 1241.

we held that the contract provision at issue was unenforceable. *See id.* ( [I]f this Court were to void [the regularly use, non-owned car] exclusion, insureds would be empowered to regularly drive an infinite number of non-owned vehicles, and receive gratis UIM coverage on all those vehicles, if they merely purchase UIM coverage on one owned vehicle.") Further still, having reviewed the record, I have found no evidentiary support for the contention that if insurers are not permitted the set-off in cases like this one, the cost of insurance will significantly increase or for the proposition that it is impossible for insurers to develop an economically feasible premium structure that accommodates the General Assembly's policy choice in this area.[6]

Finally, the majority considers a provision that the Department of Insurance has included in its standard form for uninsured motorist ("UM") coverage as indicative that the set-off provision does not contradict the MVFRL. The standard form states that "any payment made under this endorsement [related to uninsured motorist coverage] to or for any insured shall be applied in reduction of *the amount of damages* which he may be entitled to recover from any person under the Bodily Injury Liability Coverage of the policy[,]" *See* 31 Pa.Code § 63.2 Exh. C (emphasis added). I am not persuaded. I have no reason to conclude that in this context, the MVFRL's provisions for UIM and UM coverage reflect public policies that are coextensive; therefore, I do not believe that the Department's form has any bearing on this matter. Moreover, the reduction that the Department's form authorizes differs fundamentally from the reduction the Policy's set-off allows. While the Department's form calls for a reduction in "the amount of damages" that an insured may recover under a policy's liability coverage by the UM payments he has received, thereby appropriately preventing the insured from

6. In this regard, one commentator has noted that given the nature of UIM coverage, in which there is essentially a "deductible" in at least the amount of the coverage required by the financial responsibility in an accident that involves an underinsured motorist, such insurance should be relatively inexpensive coverage. Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 41.7 at 305 (2d ed. 1995).

securing a windfall or double recovery, the set-off provision reduces the Policy's UIM limits themselves by any liability coverage amounts the insured receives under the Policy, without regard to whether the insured has been fully indemnified for his losses.

Based on the foregoing, I conclude that in the circumstances presented, the Policy's set-off provision offends public policy and hence, cannot be enforced. Accordingly, I would uphold the Superior Court, and affirm its Order.